## Walter H. Bartholomew, Plaintiff in Error, v. Illinois Valley Railway Company, Defendant in Error.

### Gen. No. 5275.

1. INSTRUCTIONS—*when should be accurate.* If a case is close on the facts it is important and material that the jury should, be correctly and accurately instructed.

2. INSTRUCTIONS—*effect of giving large and unnecessary number.* The action of the court in giving a large number of instructions is liable to impress the jury with the belief that the court is instructing strongly in favor of the party at whose instance such instructions are given.

3. INSTRUCTIONS—*when upon rules of master erroneous.* An instruction which substantially tells the jury that the failure of the servant to obey a rule will preclude a recovery by him, is erroneous if it does not set forth the rule in the entirety and if it does not call the attention of the jury to other rules bearing upon the same subject-matter and if it does not permit the jury to take into account the fact that a sudden emergency shown by the evidence might justify such non-observance.

4. INSTRUCTIONS—*when as to selection of dangerous way of doing work erroneous.* An instruction which among other things tells the jury that where there are two ways open to an employe in which to do a certain act one of which is safe and the other is accompanied by dangers obvious to him or which would be obvious to him in the exercise of ordinary care on his part and he voluntarily selects the dangerous manner of doing the act in question and is injured, then, as a matter of law, he cannot recover, is erroneous if it fails to take into consideration the question whether the plaintiff was confronted by a sudden emergency which did not give him an opportunity to make a careful choice between two possible courses of conduct.

5. MASTER AND SERVANT—*when disobedience of rule does not preclude recovery.* It is not every disobedience by the servant of

a rule of a master which will preclude a recovery by such servant; a sudden emergency may arise which will justify such disobedience.

6. MASTER AND SERVANT—*when doctrine of assumed risk does not apply.* It is not a knowledge of defects by the servant which brings into operation the doctrine of assumed risk, but the knowledge of the danger arising from such defects.

Action in case for personal injuries. Error to the Circuit Court of La Salle county; the Hon. R. M. SKINNER, Judge, presiding. Heard in this court at the October term, 1909. Reversed and remanded. Opinion filed May 18, 1910.

BOTSFORD, WAYNE & BOTSFORD and BUTTERS & ARMSTRONG, for plaintiff in error.

DUNCAN, DOYLE & O'CONOR, for defendant in error.

MR. JUSTICE WILLIS delivered the opinion of the court.

This was an action brought by Walter H. Bartholomew, plaintiff in error, hereinafter called the plaintiff, against the Illinois Valley Railway Company, defendant in error, hereinafter called the defendant, to recover damages for injuries received by him on June 11, 1907, while employed by said company as a motorman, on its electric interurban railroad. There was a trial on the first four counts of the declaration, to which defendant had pleaded the general issue, and a verdict in favor of defendant. A motion for a new trial was overruled and defendant had judgment against plaintiff, and the latter has sued out this writ of error to review said judgment.

Plaintiff had worked for defendant as a motorman for nearly two months before the accident in question, and had had considerable experience before that time as motorman for other electric railway companies. He first went to work for defendant the latter part of April, 1907, and was in its employ continuously up to the time of the accident on June 11, 1907. The railway of defendant extends from Seneca, in La Salle

county, through Ottawa, La Salle, Peru and De Pue, to Princeton, in Bureau county. When plaintiff was hired by the company he first took a few trips over the line with another motorman, for the purpose of learning the road, and then was placed on a construction train, operating that train as its motorman between De Pue and Princeton. As he lived in La Salle at this time, he was obliged to ride on the company's cars in the morning from La Salle to De Pue, where he met the construction train. In the evening after the day's work was finished and he had left the construction train at De Pue, he would return to La Salle as a passenger on one of the company's cars. Thus during the time he was working on the construction train, he was not called upon to operate a car over that portion of the line on which the accident here in question happened, which was on a viaduct between the cities of La Salle and Peru. On the 20th of May, 1907, he was placed in charge of a passenger car and began making trips between Seneca and Princeton, although not regularly, as he was on the "extra" list. On the night in question, plaintiff was ordered to make a number of trips to and from the circus grounds, located in the northern part of the city of La Salle, where a circus or Wild West Show was exhibiting. He had made two round trips between the city and the show grounds before the close of the performance that evening, when he was ordered to run his car from the show grounds to Spring Valley, which is located some distance west of La Salle. There were three cars or sections in the train in which he was running, and his car was the second section. These three cars, however, were not coupled together, but were operated as separate sections, each having its own crew of two men. The second section, operated by plaintiff, started from the show grounds a little after ten o'clock. It was filled with passengers seated and standing, and the car was so full that some passengers were obliged to stand in the open doorway back of the motorman. The car in

question stopped a moment at the car barns for the purpose of procuring a new headlight, and then proceeded west towards the cities of Peru and Spring Valley. Between La Salle and Peru there is a ravine about forty feet deep spanned by a viaduct. At the time of the accident, both wagon traffic and the interurban rails were carried across the ravine by this viaduct, although since then the railway company has built another viaduct exclusively for its line. But at that time the company used the highway viaduct, the track of the company being laid on the extreme north or right hand side, going west. The trolley wire over the track was conveyed and supported across this viaduct by being fastened to a metallic arm which extended over the track from a wooden pole which had been erected in about the middle of the ravine and just north of the viaduct. The space between this wooden pole and the side of the passing car was about eighteen inches. The track made a curve to the south just before coming to the viaduct in going west.

On the night in question plaintiff approached this viaduct at the rate of five or six miles per hour. As his car was going around the curve just before reaching the viaduct, he saw a man running as if to climb on the front end of the car. Plaintiff did not stop his car, but continued on to the viaduct. He testified that the man who was running did not make any signal that he wished to have the car stop and take him on, but appeared to be trying to steal a ride. After the car was out on the viaduct, plaintiff shut off the power, threw the air brake half on, stepped to the right hand or north edge of the car platform and, grasping the side handles, leaned out and looked back. As he did so, he was struck by the pole described above and was thrown to the bottom of the ravine. The car was stopped near the west end of the viaduct and when plaintiff was brought up to the highway again and taken to the hospital, he was found to have sustained very serious injuries of a permanent character. His

left leg had to be amputated; he partially lost the use of his right arm and right hand; his jaws were dislocated so that he cannot masticate his food, and he was injured on the head and chest.

Defendant claims that the verdict of the jury and the judgment of the court are correct and the only conclusion which could be reached under the evidence, for the reasons, first, that plaintiff was bound to know of the location of this post so close to passing cars, and therefore assumed the risk arising from the location of the post; and, second, because the plaintiff was guilty of contributory negligence at the time the accident occurred. In support of the first point, defendant relies upon the fact that Bartholomew had gone over this viaduct sixty-two times, not counting his trial trips over the line, and on most of such trips had been acting as motorman, and argues therefrom that he could not fail to know where this wooden pole stood with relation to passing cars. We are unable to sustain this contention. Plaintiff was not required to perform any duty in regard to this pole. There is no evidence in the record that his attention had ever been directed to this pole by any officer or employe of the company. On the north or right hand side of the company's right of way, on which this pole stood, there was nothing which required the attention of motormen to be directed that way in passing over the viaduct. No teams or foot passengers could traverse the viaduct on that side, and there was nothing there to interfere with the passage of a car or for which a motorman need be on the watch. On the other hand, the south side of this viaduct was used for the passage of teams and, as this was practically the only highway connection between the cities of La Salle and Peru, a large amount of teaming was necessarily in almost continuous use of that part of the viaduct. There was no wall between the highway used by teams and the track of defendant. It was therefore necessary for the motorman on a car passing over this viaduct to be

watchful of the traffic to the south of him to avoid colliding with any teams coming too close to the track. It seems to the court that this would be one of the chief duties of a motorman in crossing the viaduct, and that he might very easily pass the pole in question a great many times and not have his attention directed to it at all.

The second defense urged by defendant, namely, that plaintiff was guilty of contributory negligence and so could not recover, presents a close question, under the evidence. One of the rules for trainmen under which this company was operated was offered in evidence as Rule No. 190. It read as follows: "In case of accidents, however slight, to personal property, in connection with or caused by any train the trainmen in charge of same will render all assistance necessary and practicable, and make the best of the situation. In no case will they go away leaving injured persons without first having seen that they are cared for. Conductors and motormen will make immediate verbal report to dispatcher of any accident, blockade or mishap of any kind." Plaintiff testified that he saw a man running as if to board his car at the front end just before the car went upon the viaduct and it is implied from his evidence, and is the theory of the case made by the plaintiff, that he feared the man had not succeeded in boarding the car but had fallen under the wheels, and that his action in slowing the speed of the car and in looking back was for the purpose of seeing whether such an accident had occurred, and that his doing so was in full accord with said Rule No. 190; and also that plaintiff did not stop his car at once upon conceiving that this man might have fallen under the wheels, because his car was being closely followed by the third section of the train and he feared a rear end collision. Defendant introduced proof tending to show that the motorman had made conflicting statements as to his reason for looking back along the side of the car, and suggests that his actions in that regard

were actuated mainly by a desire to "show off" before some young women who were standing in the open front door of the car just behind him.

In view of the conflicting evidence and the closeness of the question as to contributory negligence on the part of the plaintiff, it was very important and material that the jury should be instructed correctly; and plaintiff complains of instructions numbered from 4 to 39 given at the request of defendant. The court gave thirty-five instructions at the request of the defendant. We can see no necessity for the giving of such a large number of instructions, and we regard such action by the court as liable to impress the jury with the belief that the court was instructing strongly in favor of the defendant. This court, in Pioneer Fire Proofing Co. v. Clifford, 135 Ill. App. 417, disapproved of the practice of giving a large number of instructions, some of which were mere repetitions of others. Some of these given instructions are in our opinion erroneous. Instruction No. 37 was to the effect that if a certain rule of the company, set out therein, was delivered to plaintiff by defendant in error and was the only rule on that subject, and if plaintiff just before the accident acted contrary to the rule in leaving the mechanism of his car and attempting to do something besides control the mechanism and watch the road, and thereby caused the accident, he could not recover and the jury should find the defendant not guilty. Instruction No. 38 was substantially the same. The rule therein referred to is only partially quoted in these instructions, the quotation stopping in the middle of a sentence and not including three parts of the rule, the last of which implies that the motorman may have cause to leave the operating mechanism and position, but that he must not leave the platform of the car except in a single contingency stated. There is also another rule of the company which had a possible bearing upon what seemed to be the duty of plaintiff under the circumstances, namely, Rule 190, which

we have set out in full above, and which requires that trainmen should not leave persons injured without caring for them. It is argued that if, as the evidence tends to show, plaintiff feared a man had fallen under his car, he should, in obedience to Rule 190, have stopped his car at once and then descended to the ground before looking to see if an accident had happened; and that, in allowing his car to continue in motion and in leaning out from the car to look back, he was both failing to obey Rule 190 and was guilty of negligence in regard to his own safety. We cannot agree with this position. This car was heavily loaded with passengers and was closely followed by another section of the same train. If plaintiff had stopped his car at this point, right in front of the third section and just beyond a curve, he might have produced a still more serious accident; and he may well have been in doubt as to what his duty required of him, and he may have believed it his first duty to ascertain how near the other car was to him before bringing his car to a complete stop. If the evidence of Bartholomew was true, he was confronted with a sudden emergency, and he could not be required to act with the same deliberation as if he had had ample time to consider the entire situation. Instructions 37 and 38 therefore not only omit to set out other rules imposing other duties upon the motorman, but they fail to take cognizance of his evidence tending to show that an apparently serious situation suddenly confronted him. Besides, we do not think it can be said to be the law that in every case mere disobedience of a rule, where an emergency seems to call for such disobedience, will cause the employe, if injured, to lose his right to recover damages therefor. Again, we are of opinion that there was no evidence in this case from which the jury could find that the violation by plaintiff of the rule requiring a motorman to do nothing but handle the operating mechanism and watch the road, caused the accident. As we view the matter, under the evidence

the violation of the rule did not cause the accident at all. If Bartholomew had left the mechanism and looked back a moment later, he would not then have been hurt. We regard it as a correct statement to say that his leaving the mechanism and going to the side of the car and looking back merely afforded the opportunity for the injury, but that it no more caused the injury than it could be said that plaintiff caused the injury by going to work that day. If, upon his leaving the mechanism, it had exploded and injured him when it would not have done so if he had remained by it, or if, because of his leaving the mechanism, the car had struck some object in front of it and he had thereby been injured, then it could be said that his act in leaving the mechanism and the position required of him by the rules of the company was the cause of the injury. We are of opinion that the jury could not reasonably find that the leaving of the mechanism in this case caused the injury or tended to cause it, but merely that it gave him the opportunity to be in the place where he was hurt. Smithwick v. Hall & Upson Co., 59 Conn. 261; Fickett v. Lisbon Falls Fibre Co., 91 Me. 268; Helfenstein v. Medart, 136 Mo. 595; Horan v. C. St. P. M. & O. Ry. Co., 89 Ia. 328, and Southern Ry. Co. v. Baston, 99 Ga. 798, are cases illustrating our view that the leaving of his position did not cause this injury.

Instruction No. 39 told the jury, among other things, that where there are two ways open to an employe in which to do a certain act, one of which is safe and the other is accompanied by dangers obvious to him, or which would be obvious to him in the exercise of ordinary care on his part, and he voluntarily selects the dangerous manner of doing the act in question, and is injured, then, as a matter of law, such employe has no right of action against his employer for any damages growing out of such injury. This instruction is a correct statement of the law, so far as it goes, but it fails to take into consideration the question whether plaint-

iff in this case was confronted by a sudden emergency which did not give him an opportunity to make a careful choice between the two possible courses of conduct, nor whether he could safely stop his car when followed so closely by another just beyond the curve. We think this instruction should not have been given in this case without some modification.

Instruction No. 23 told the jury that if Bartholomew did not exercise ordinary care to discover the condition of this pole, he could not recover. We think this instruction erroneous. It is true that plaintiff was bound to exercise ordinary care within the line of his employment, but he was not charged with the duty of inspection, and it was for the jury to determine whether or not the exercise of ordinary care on the part of Bartholomew in the performance of his duties would have attracted his attention to the position of the pole. Instructions Nos. 18 and 26 were erroneous in that, while leaving it to the jury to determine whether plaintiff knew of the existence of the pole and its proximity to the track, or by the exercise of ordinary care could have known of it, they failed to leave to the jury the question whether plaintiff knew of the danger caused by the nearness of the pole to a passing car. In numerous cases in this state it has been held that there is a distinction between knowledge of certain defects and knowledge of the danger arising from such defects. North Chicago St. R. R. Co. v. Dudgeon, 184 Ill. 477; Byrne v. Marshall Field & Co., 237 Ill. 384.

We are of opinion that plaintiff is entitled to another trial. The judgment will therefore be reversed and the cause remanded.

*Reversed and remanded.*